IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

**Plaintiff,**

v.

[1] LUIS NOMAR ISAAC-SANCHEZ,

**Defendant.**

CRIM. NO. 24-124-1 (RAM)

OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is Defendant Luis Nomar Isaac-Sanchez's ("Isaac") amended motion for a *de novo* bail review ("*Motion*"). (Docket No. 144). For the reasons set forth below, the Court **GRANTS** the *Motion* subject to the conditions specified herein and in the separate order of release.

I.   BACKGROUND

On March 29, 2024, a federal *Complaint* was filed against Mr. Isaac and his three co-defendants, Joshua Enrique Bula-Cartagena ("Bula"), Kevin Manuel Bonilla-Ramirez ("Bonilla"), and Eli Yaniel Couvertier-Pollock ("Couvertier") for aiding and abetting the possession of a machine gun on October 31, 2023. (Docket Nos. 1 and 1-1). The four co-defendants were originally charged in the Court of First Instance, San Juan Superior Court ("Commonwealth Court"). (Docket No. 16 at 2). The Commonwealth Court dismissed

the case against Mr. Bonilla on November 7, 2023, and against
Messrs. Isaac, Bula, and Couvertier on March 25, 2024. Id.

The federal *Complaint* was filed shortly after, and Mr. Isaac's
initial appearance was held on April 2, 2024. (Docket Nos. 1 and
11). The United States of America (the "Government") moved for
detention without bail on April 3, 2024. (Docket No. 16). The next
day, a Grand Jury returned a one-count Indictment charging the
four co-defendants with illegal possession of a machine gun, aiding
and abetting, in violation of 18 U.S.C. §§ 922(o) and 2. (Docket
No. 19 at 1).

Magistrate Judge Marcos E. López held detention hearings as
to Mr. Isaac on April 5, 2024, and April 9, 2024. (Docket Nos. 27
and 67). After hearing from the parties and receiving exhibits,
the Magistrate Judge ordered that Defendant be detained pending
trial. (Docket No. 64). In his order, he noted that Mr. Isaac
admitted to making music videos in which he displayed real
firearms, and that there was no evidence that he had a license to
own or use firearms. Id. at 3. Additionally, the Magistrate Judge
expressed concerned that Defendant had the ability to "readily and
unlawfully access and possess firearms." Id.

Mr. Isaac subsequently filed a *Motion for De Novo Review of
U.S. Magistrate Judge's Detention Order and Memorandum of Points
and Authorities* on July 2, 2024. (Docket No. 135). The Government

timely responded by July 18, 2024, (Docket No. 142), but on that same day Defendant filed the instant amended *Motion*, mooting both his previous motion and the Government's response.[1] (Docket Nos. 144 and 147). In his *Motion*, Mr. Isaac contends that the Magistrate Judge erred by (1) failing to consider less restrictive alternatives than detention and (2) basing his decision on insufficient evidence. (Docket No. 144 at 8). The Court held a *de novo* hearing, which took place on August 7, 2024; August 28, 2024; and September 3, 2024. *See* (Docket Nos. 160, 175, and 182) (minute entries); (Docket Nos. 163, 178, and 187) (transcripts).

At the hearing, the Government called Homeland Security Investigations ("HSI") Special Agent Michael Villanueva-Acevedo ("SA Villanueva") and presented several exhibits. The Defendant called Orlando Wharton ("Wharton") and Puerto Rico Police Bureau ("PRPB") Agent Héctor M. Solivan-Cartagena ("Agent Solivan").

## II. FINDINGS OF FACT

The Bail Reform Act directs the judicial officer to include written findings of fact in a detention order. *See* 18 U.S.C. § 3142(i)(1). The below findings of fact are drawn only from the information and testimony presented at the *de novo* hearing

---

[1] Defendant also filed a reply, which the Court has reviewed and considered. *See* (Docket No. 151).

Criminal No. 24-124-1 (RAM)                                         4

conducted on August 7, August 28, and September 3, 2024.[2] Furthermore, these findings of fact have been made solely for the purpose of deciding the pending *Motion*. *See* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.").

**A. Testimony of SA Villanueva**

SA Villanueva testified he became familiar with the case because it was referred to him by PRPB officers from the San Juan Intelligence Unit. On October 31, 2023, the PRPB received a tip regarding armed individuals. The officers observed four people walking down Tito Rodriguez Street in the Barrio Obrero area of San Juan at approximately 6:10 to 6:15 am. The agent stated that Barrio Obrero is a high-crime area, and on that date, sunrise occurred at approximately 6:24 am. Among the group of four was Mr. Isaac, who one agent observed possessing a firearm with an extended magazine that was protruding from his front waistband. He, Mr. Bonilla, Mr. Bula, and Mr. Couvertier entered a red Jeep Grand Cherokee with Defendant sitting in the driver's seat. At that point, a marked police car pulled behind the vehicle and an

---

[2] Exhibits relevant to the *de novo* hearing were filed at Docket Nos. 183-1, 184-1, 186-1, and 186-2. Later references to these exhibits shall be cited as follows: (Exhibit __). English translations of the exhibits that are in compliance with L. Civ. R. 5(c), extended to criminal cases by L. Crim. R. 112, were to be filed on the docket within seven days of their admission.

unmarked police car pulled in front of it. When the vehicle was boxed in, all its occupants ran from the officers.

An agent saw Mr. Isaac running while gripping his pistol,[3] and the agent fired one shot. However, Defendant continued running out of sight for approximately ten minutes. After he was apprehended, agents observed a pistol in the center console of the Jeep. The pistol grip was leaning toward the driver's side, and the barrel of the pistol was facing the front. SA Villanueva initially prepared an affidavit describing the events of October 31, 2024, in which he indicated that Defendant was arrested in a rooftop of a residence. On the stand, however, the agent explained that he had misunderstood the location and that Mr. Isaac had been apprehended in a backyard instead.

PRPB agents then applied for a commonwealth search warrant, which was granted at approximately 6:30 pm that day. Pursuant to that warrant, the PRPB discovered that the pistol in the center console had been modified to fire fully automatic through a device known as a "chip." Additionally, agents also discovered a firearm with a red dot sight and flashlight attachment that was **not** modified to fire fully automatic near the rear passenger seat. The

---

[3] Defense counsel stipulated that Defendant fled. *See* (Docket No. 163 at 17).

PRPB also seized several magazines and live rounds of ammunition, while HSI agents seized the cell phones of all the car's occupants.

Mr. Isaac provided HSI agents with consent to search his phone, along with his pass code. *See* (Exhibit 1). HSI agents conducted a full cell phone extraction for the device and discovered evidence of Mr. Isaac holding weapons, being near weapons, and participating in group chats involving firearm transactions. The evidence included the following:

1. Videos depicting Defendant holding rifles and pistols, wearing body armor, and carrying modified[4] firearms. (Exhibits 3A, 3B, 3C, 3D, and 4).

2. A picture of Mr. Isaac sitting in a stairwell with three rifles, two of which bear distinctive features. One of the firearms is an AK-style rifle with a Picatinny rail and paracord wrapped around the stock. The other is an AR-style rifle that has a distinctive gold trigger and an orange tip. The firearms were later recovered from near the Sabana Abajo Public Housing Project on March 29, 2024, in the vicinity of an area where a PRPB officer was murdered. The firearms were real, functioning weapons and bore the same distinctive

---

[4] SA Villanueva testified that the firearms were modified to fire automatically using an aftermarket back plate or "chip."

markings as the rifles in the stairwell picture. (Exhibits 5, 6, 7, and 8).

3. WhatsApp group chats that Defendant was a member of; the chats included messages about illegal firearms transactions, including discussions about modifying a weapon to enable it to fire automatically.

During cross-examination, SA Villanueva conceded that Defendant appeared in various music videos wearing the same clothing that he wore in Exhibits 3A, 3C, and 5. He further acknowledged that Mr. Isaac appeared to be posing in Exhibits 3B, 3D, and 4.

SA Villanueva further testified that a federal arrest warrant was issued for Mr. Isaac on March 29, 2024, and a be-on-the-lookout ("BOLO") alert was issued to apprehend him. Defendant turned himself in on April 1, 2024, and he was interviewed the following day. He voluntarily waived his Miranda rights, (Exhibit 9A), and communicated to HSI agents that (1) he knew there were two pistols in the red Jeep prior to entering the vehicle; (2) he knew that approximately eighty-five percent of the guns used in his music videos were real; and (3) he had access to firearms.

**B. Proffer by the Government**

The Government further proffered that while the Defendant was on commonwealth bail, he violated the conditions of release on

multiple occasions. By his own admission, Mr. Isaac left an
established perimeter set out in his bail conditions to attend
interviews and film videos. A social worker supervising him at the
time filed a motion in Commonwealth Court stating that Defendant
had engaged in "a pattern of outings without authorization" and
that "when [Mr. Isaac] is offered guidance he shows little
interest." (Exhibit 10A).

### C. Testimony of Mr. Wharton

Mr. Wharton is an executive vice president at Universal Music
Group ("Universal") who signed Mr. Isaac to his label in 2023.
(Exhibit A). He testified that, under the moniker "CDobleta,"
Defendant performs drill/trap/reggaeton music and projects an
artistic persona of a "young kid from Puerto Rico coming from the
projects." Mr. Wharton explained that in his private life, Mr.
Isaac is a "really nice kid" and "always respectful." Moreover,
the CDobleta persona is "all an act" and Defendant is "just
portraying what he would think people from that type of lifestyle
would be doing." The witness has never seen Defendant bearing or
possessing weapons outside of a music video, and the only problems
Mr. Wharton has encountered regarding Mr. Isaac are his legal
problems. The witness is friendly with the Defendant and familiar
with his friends and family. Prior to Mr. Isaac's career as a

musician, he gained an Instagram following for performing motorcycle tricks.

To market Defendant's music, Universal creates music and promotional videos. Universal hires the director, the director decides on the props, and Mr. Isaac is simply expected to show up and participate in the video. In addition to music videos, the artist also shoots behind-the-scenes video or extra scenes for additional marketing material. Mr. Wharton explained that Exhibits 3A, 3B, 3C, 3D, 4, and 5 were promotional videos or photos created for platforms such as World Star Latino and TikTok. When asked about a video in which Defendant was wearing a military-style vest, the witness explained that Mr. Isaac was dressed as a character, and the costume was an exaggerated, ridiculous image because "[w]ho would wear that in real life?"

Mr. Wharton testified that Universal maintains a policy against real weapons being used in videos, and on cross-examination he clarified that by "real weapons" he meant illegal firearms. Specifically, Universal does not promote the breaking of laws, and directors are responsible for ensuring that the music videos comply with all laws.

Universal provided Mr. Isaac with an advance of a couple hundred thousand dollars. He also earns an income by booking shows. (Exhibit B). Defendant has approximately 700,000 followers on

Instagram; 312,000 subscribers on YouTube; and 1.6 million monthly listeners on Spotify. (Exhibits C, D, and E).

### D. Testimony of Agent Solivan

Agent Solivan received a phone call around 2:00 or 3:00 am on the morning of October 31, 2023, from PRPB Agent Joseph D. Pita-Lamboy ("Agent Pita") regarding a tip that four armed individuals were present in Café Claro. Agent Solivan was in uniform and in a marked patrol car. At the hearing, Agent Solivan described the topography of Barrio Obrero and noted that he was parked on Sagrado Corazon Street when he received a call from Agent Pita at approximately 6:00 am, who relayed that the subjects of the surveillance were walking toward the red Jeep parked on Tito Rodriguez Street. Agent Solivan parked behind the Jeep and during the subsequent intervention, firearms were found inside it. Agent Solivan also noted that he was not the agent who observed Defendant with a firearm in his waistband. During the intervention, Agent Pita fired his service weapon.

### E. Proffer by Defendant

Mr. Isaac moved the Court to take judicial notice of several Commonwealth Court documents, which the Court did. (Exhibits F, G, and H). Through counsel, he proffered that Agent Pita's testimony would have meaningful issues, including that the officer would not have had a clear line of sight from Tito Rodriguez Street to Café

Claro; that details were communicated to other officers by phone and not by radio; and that the extended magazine protruding from Defendant's waistband was twelve inches long. Additionally, defense counsel proffered that PRPB Agent Yesire Melanie Mitchells-Solis ("Agent Mitchells") would testify that she never saw Defendant armed; that she never saw police dogs on the scene; and that weapons were found in the red Jeep's glove compartment, not center console. Moreover, defense counsel proffered that a gunshot reporting system indicated that a weapon was fired at 6:11 am, prior to sunrise.

It was further proffered that Defendant's mother would testify that he was a basketball player with a high school scholarship and was kicked out for having a tattoo, and that Defendant's ailing uncle would testify that Mr. Isaac was his sole source of financial support for medical care.

### III. LEGAL STANDARD

#### A. Standard of review for a detention or release order

A district court reviews a magistrate judge's order of detention or release under a de novo standard and "need not defer to the magistrate judge's findings or give specific reasons for rejecting them." United States v. Cidraz-Santiago, 18 F. Supp. 3d 124, 126 (D.P.R. 2014) (citations omitted). A district court may also "take additional evidence or conduct a new evidentiary

hearing" when "the defendant has placed relevant facts at issue."
Id.

### B. The Bail Reform Act

Pursuant to the Bail Reform Act of 1984, a judicial officer must determine whether a person charged with an offense shall be detained or released pending trial. *See* 18 U.S.C. § 3142(a). Section 3142(e) of the Bail Reform Act provides that if, after conducting a hearing, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." Id. § 3142(e).

A statutory presumption in favor of detention does not apply to this case. *See* United States v. Berríos-Aquino, 2022 WL 17075919, at *2 (D.P.R. 2022) (noting that the offense of possession of a machine gun is not listed in sections 3142(e)(2) or (3) of the Bail Reform Act). However, the Bail Reform Act authorizes pretrial detention in cases where the charged crimes include a felony involving the possession or use of a firearm or any other dangerous weapon. *See* id.; 18 U.S.C. § 3142(f)(1)(E). Detention is also authorized in cases where there is a serious risk that the defendant may flee. *See* id.; 18 U.S.C. § 3142(f)(2)(A).

i.   <u>Standard of proof</u>

The standard of proof for detention on the grounds of dangerousness is clear and convincing evidence. 18 U.S.C. § 3142(f). Clear and convincing evidence is "more than preponderance of the evidence but less than beyond a reasonable doubt." <u>United States v. Acevedo-Ramos</u>, 600 F. Supp. 501, 509 (D.P.R. 1984) (citations omitted), *aff'd*, 744 F.2d 203 (1st Cir. 1985) (Breyer, J.). This standard requires "a high degree of certainty that the information presented supports the conclusion of dangerousness or risk to the obstruction of justice." <u>Id.</u> On the other hand, the standard of proof for detention on the grounds of risk of flight is preponderance of the evidence. <u>United States v. Patriarca</u>, 948 F.2d 789, 793 (1st Cir. 1991).

ii.   <u>Factors the Court must consider</u>

To determine whether there are conditions of release that assure a defendant's appearance and the safety of the community, judicial officers must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's personal history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

## IV.  DISCUSSION

After considering the proffers of counsel, the evidence presented, the arguments of the parties, the Pretrial Services Report, and the transcripts of the initial detention hearing, the Court finds that the Government has not proven by the relevant standards that no conditions of release could reasonably assure the safety of the community and Defendant's appearance as required.

### A. The nature and circumstances of the offense charged

As discussed above, Mr. Isaac was charged with illegal possession of a machine gun, aiding and abetting. (Docket No. 19). This is a serious offense. *See* Berríos-Aquino, 2022 WL 17075919, at *2; United States v. Diaz-Collazo, 2018 WL 377277, at *2 (D.P.R. 2018). If convicted, Defendant faces up to ten years' imprisonment. *See* 18 U.S.C. § 924(a)(2). Moreover, the machine gun at issue was found in the center console of a vehicle that would have presumably been driven on a public street. This circumstance of the offense also favors detention. *See* Diaz-Collazo, 2018 WL 377277, at *2 (noting defendant possessed a machine gun in a public area); United States v. Mieses-Casiano, 161 F. Supp. 3d 166, 169 (D.P.R. 2016) (ordering detention of defendant who carried machine gun on public sidewalk, ran from police, and tossed firearm while fleeing).

Based on the testimony presented, Defendant fled from the PRPB for approximately ten minutes, though he appears to argue

that the flight was justified because Barrio Obrero is a high crime
neighborhood and an unmarked car boxing in his vehicle from the
front around 6:00 am made him afraid. *See* (Docket No. 144 at 15).
According to Defendant's *Motion*, he only stopped running because
he injured himself. <u>Id.</u> The standard to establish a risk of flight
is low: a preponderance of the evidence. Thus, the evidence
presented as to why Mr. Isaac ran from authorities at the time of
his arrest weighs slightly in favor of detention based on his risk
of flight.

**B. The weight of the evidence against Defendant**

The Government presented several exhibits throughout the *de
novo* hearing, including photos and videos of the Defendant holding
various firearms. However, the majority of this presentation
constituted evidence that, pursuant to Fed. R. Evid. 404(b),
related to **other** crimes, wrongs, or acts separate from the offense
charged in the indictment. *But see* <u>Berríos-Aquino</u>, 2022 WL
17075919, at *2-3 (considering videos of defendant shooting a
machine gun on other occasions in evaluating the weight of the
evidence).

As related to the events of October 31, 2023, the weight of
evidence for bail purposes derives from the testimony of SA
Villanueva, who was not present at the scene himself but had
interviewed Mr. Isaac and reviewed materials related to the case.

The Court also notes that the federal Grand Jury found probable cause by returning a true bill against the four co-defendants. Although the witness testimony proffered by the Defendant could call into question aspects of the Government's version of the facts, so far, there is no evidence presented before the Court that is "inconsistent with a finding of guilt." Diaz-Collazo, 2018 WL 377277, at *2 (citing United States v. Gray, 529 F. Supp. 2d 177, 181 (D. Mass. 2007)). This factor then, moves the needle slightly in favor of detention.

Regardless of the import or weight of the evidence proffered by the Government, the Court is not concerned with Mr. Isaac's guilt or innocence at this stage. See 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence."). The Court's task is to assess whether there is a set of conditions that "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c).

## C. Defendant's personal history and characteristics

Per the Pretrial Services Report, Mr. Isaac has been a lifelong resident of Puerto Rico. He possesses a passport and has previously traveled to the Dominican Republic and the U.S. mainland, and he is a Spanish speaker with limited fluency in English. He has been in a four-year relationship with his partner,

and he has three young children. Mr. Isaac's family and Mr. Wharton attended the *de novo* hearing in Defendant's support, and his *Motion* indicates that his family is willing to put up approximately $100,000 in real property as collateral. Defendant began working with Universal Music Group in mid-2023 as a recording artist and performer, for which he received an advance of several hundred thousand dollars. He also has a non-trivial audience on various social media platforms.

Together, Mr. Isaac's personal history and characteristics indicate that Defendant is unlikely to be a risk of flight, and they favor release. Although access to financial resources in cash could make it easier to leave the jurisdiction, the Court also believes that Defendant's recognizability in the District of Puerto Rico and his contractual obligations to Universal would discourage him from attempting to flee. Other factors mitigating the risk of flight are that Defendant resides in Puerto Rico, is a father of young children, and has family members willing to post property to secure bail. *See* United States v. Torres-Rosario, 600 F. Supp. 2d 327, 335 (D.P.R. 2009).

**D. The nature and seriousness of the danger to any person or the community that would be posed by Defendant's release**

The Government presented numerous photos and videos showing Mr. Isaac carrying pistols and rifles in public places.[5] Additionally, the Court takes note of the fact that Defendant purportedly carried a firearm in his waistband that he may have disposed of and has yet to be found by law enforcement. A second firearm was found in the center console of a vehicle he was about to drive on a public street, with the handle pointed toward the driver's seat. Moreover, the instant offense is not the first time that Defendant has been charged with a weapons-related crime. According to the Pretrial Services Report, Mr. Isaac was charged with driving under the influence and possessing ammunition, although the latter charge was eventually dismissed. (Docket No. 18 at 4).

Furthermore, Defendant regularly posed with and displayed real firearms in videos and photos. Regardless of whether this content was produced in furtherance of his artistic endeavors, the fact remains that Mr. Isaac had easy access to what he knew were functioning weapons, and that he likely carried them in violation

---

[5] There is no information in the record that indicates whether Mr. Isaac had a permit or license. Regardless, Puerto Rico law prohibits open carrying of firearms even if the individual has a license. *See* United States v. Aviles-Vega, 783 F.3d 69, 73 (1st Cir. 2015).

of Puerto Rico weapons law. A crime caught on camera and posted to social media is still a crime. The fact that Defendant violated the terms of his commonwealth supervision to make a music video and participate in an interview also does not engender great confidence in his respect for the law and the conditions set by a court.

SA Villanueva further testified that Defendant was a member of group chats in which firearms transactions were discussed, although, in contrast with the *de novo* hearings of his co-defendants, no evidence was presented that he brokered sales. *See* United States v. Bula-Cartagena, 2024 WL 2091542, at *7 (D.P.R. 2024) (discussing seriousness of facilitating illegal firearms transactions and permitting pretrial release); United States v. Couvertier-Pollock, 2024 WL 1756504, at *6 (D.P.R. 2024) (same).

While Mr. Isaac is accused of a serious offense, the Court nevertheless finds that there are conditions of release that can reasonably assure the safety of the community and Defendant's appearance as required in this case. These conditions include, but are not limited to, submitting to home detention with electronic monitoring, posting a $100,000 secured bond, and submitting to supervision by a third-party custodian. Although superfluous given the prior violations of his Commonwealth Court bail, **the Defendant is warned that failure to comply with the conditions of release in**

**this case will trigger revocation proceedings and, potentially, result in a return to pretrial detention.** *See* <u>Torres-Rosario</u>, 600 F. Supp. 2d at 336 (permitting release under "highly stringent release conditions" and noting that "deviation from [the release order] will result in an immediate revocation [of defendant's] liberty").

Mr. Isaac's mother offered to serve as a third-party custodian. However, he was residing with her in Sabana Abajo when photos of him holding firearms were taken; when he was arrested on October 31, 2023; and when he violated his commonwealth conditions of release. Defendant's mother is therefore unlikely to be able to effectively monitor his conduct. The *Motion* alternatively proposes that his grandmother serve as third-party custodian; she resides in an unspecified location in Carolina, Puerto Rico. Thus, the Court will permit Mr. Isaac's pretrial release only if his grandmother or an alternative third-party custodian and their residence is found suitable by the U.S. Probation Office.

Because the testimony presented at the *de novo* hearing indicates that Defendant was aware he was handling real firearms in his music videos despite any purported precautions taken by Universal or its directors, the Court will not allow any further access to weapons. Moreover, the Court is wary of the fact that Mr. Isaac previously defied the conditions of his commonwealth

release by claiming he was recording videos or participating in videos. *See* (Exhibit 10A). Thus, Mr. Isaac will not be permitted to leave home detention under any circumstances unless prior approval of his probation officer is obtained.

## V.    CONCLUSION

For the foregoing reasons, the Defendant's *Motion* for bail at Docket No. 144 is **GRANTED**. Defendant Luis Nomar Isaac-Sanchez shall be released subject to the following conditions:

1. Defendant must not violate federal, state, or local law while on release.

2. Defendant must cooperate in the collection of a DNA sample if it is authorized by 42 U.S.C. § 14135a.

3. Defendant must advise the Court, the U.S. Probation Office, or the supervising officer in writing before making any change of residence or telephone number.

4. Defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the Court may impose.

5. Defendant will execute a secured bond binding Defendant to pay the United States the sum of $100,000 dollars in the event of a failure to appear as required or to surrender as directed for service of any sentence imposed.

6. Defendant will submit a proposed third-party custodian, as approved by the U.S. Probation Office, who is not his mother and who resides outside of the Sabana Abajo Public Housing Project. The third-party custodian must agree to (a) supervise Defendant, (b) use every effort to assure his appearance at all court proceedings, (c) notify the Court immediately if Defendant violates a condition of release or is no longer in the custodian's custody, and

(d) surrender any firearms he or she might possess. Defendant shall reside with the third-party custodian.

7. Defendant shall submit to location or electronic monitoring as directed by the U.S. Probation Office or supervising officer and comply with all the program requirements and instructions provided.

8. Defendant's release is conditioned upon qualification of the third-party custodian and of his or her residence, as well as verification by the United States Probation Office of electronic monitoring device capability in the proposed residence.

9. Home detention with electronic monitoring: Defendant shall be restricted to the third-party custodian's residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the U.S. Probation Officer.

10. Defendant shall continue or actively seek employment.

11. Defendant shall maintain or start an education program.

12. Defendant shall submit to supervision by and report for supervision to the U.S. Probation Office.

13. Defendant shall surrender any passport to the U.S. Probation Office.

14. Defendant shall not obtain a passport or other international travel document.

15. Defendant shall reside at the address of record that is approved by the U.S. Probation Office.

16. Defendant shall not leave the jurisdiction of this District without first obtaining written permission from the Court.

17. Defendant shall avoid all contact directly or indirectly, with any person who is or may be a victim or

witness in the investigation or prosecution, including all co-defendants of the instant case.

18. Defendant shall permit access by the U.S. Probation Office, the supervising officer, and the third-party custodian to any computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communication devices in his possession to ensure compliance with the conditions of release.

19. Defendant shall undergo medical or psychiatric treatment if deemed necessary by the U.S. Probation Office.

20. Defendant shall refrain from possessing firearms, destructive devices, or other dangerous weapons.

21. Defendant shall refrain from excessive use of alcohol.

22. Defendant shall refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

23. Defendant shall submit to testing for a prohibited substance if required by the U.S. Probation Office or the supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. Defendant must not obstruct or attempt to obstruct, or tamper with, the efficiency and accuracy of prohibited substance screening or testing.

24. Defendant shall participate in a program of inpatient or outpatient substance abuse therapy and counseling as deemed necessary by the U.S. Probation Office or the supervising officer.

25. Defendant shall report as soon as possible any contact with any law enforcement personnel, including, but not limited to, any arrest, questioning, or traffic stop to the U.S. Probation Office or the supervising officer.

26. The Chief U.S. Probation Officer or his designee may authorize temporary changes of address and overseas

travels to the mainland United States only, not exceeding fifteen calendar days, provided the U.S. Attorney has no objection to it. If objected, the request must be made in writing to the Court.

27. Defendant shall not enter any airport or pier with the exception stated above.

28. Defendant shall not enter or remain at any of the named places in the instant Indictment, or the Sabana Abajo Public Housing Project.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 12th day of September 2024.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE